1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**United States District Court**
For the Northern District of California

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

SAIYEZ AHMED,                                    )    No. C 02-5207 SBA (pr)
                                                 )
                    Petitioner,                  )    **ORDER DENYING PETITION**
v.                                               )    **FOR WRIT OF HABEAS**
                                                 )    **CORPUS**
JAMES A. YATES, Warden,                          )
                                                 )
                    Respondent.                  )
_____         )

**INTRODUCTION**

This matter is now before the Court for consideration of Petitioner's pro se petition for a

writ of habeas corpus under 28 U.S.C. § 2254 concerning his 1998 conviction in Contra Costa

County Superior Court.  Warden James A. Yates (hereinafter "Respondent") opposes the

petition.  Petitioner filed a traverse.  For the reasons discussed below, the petition will be

DENIED.

**BACKGROUND**

I.    **Case History**

On June 3, 1998, by amended information, Petitioner was charged with three felonies:

(1) forcible kidnap (Cal. Penal Code § 207(a)); (2) attempted murder (Cal. Penal Code §§ 187,

664); and (3) robbery (Cal. Penal Code §§ 211, 212.5(c)).  It was further alleged that, under

California's Three Strikes law,[1] Petitioner suffered three prior strikes (Cal. Penal Code §§

667(a), 1170.12(c)(2)).

---

[1] California's Three Strikes law appears in California Penal Code § 667(b)-(i).  The heart of the Three Strikes law is § 667(e), which prescribes increased terms of imprisonment for defendants who have previously been convicted of certain "violent" or "serious" felonies.  Under this subdivision, a third strike defendant (with two or more prior felony convictions) receives an indeterminate term of life imprisonment, which includes a minimum term.  The minimum term for a third strike defendant is the greatest of (i) "[t]hree times the term otherwise provided as punishment for each current felony conviction subsequent to the two or more prior felony convictions," (ii) twenty-five years imprisonment in the state prison, or (iii) "[t]he term determined by the court pursuant to Section 1170 for the underlying conviction," including any applicable enhancements. Cal. Penal Code § 667(e)(2)(A).  These provisions apply in addition to any other enhancements or punishment provisions which may apply.  Cal. Penal Code § 667(e).

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**United States District Court**
For the Northern District of California

On December 4, 1998, Petitioner was convicted of the lesser included offense of false imprisonment (Cal. Penal Code § 236), acquitted of the attempted murder charge, and found guilty as charged of one count of second-degree robbery.  Petitioner's priors were bifurcated for trial and submitted to the court for determination.  (Answer at 2.)  The trial court found Petitioner's three prior strike allegations (three 1992 convictions for assault with a deadly weapon with personal use of a firearm) to be true.  (Id.)  On January 22, 1999, Petitioner was sentenced to state prison for twenty-five years to life pursuant to California's Three Strikes law.  (Id.)

Petitioner's direct appeal was rejected by the California Court of Appeal on July 31, 2001.  See Resp't Ex. C.  Petitioner filed a petition for review in the California Supreme Court on August 16, 2001 raising his three unexhausted claims.  See Resp't Ex. D.  The California Supreme Court rejected Petitioner's petition for review on October 24, 2001.  See Resp't Ex. E.

On October 28, 2002, Petitioner filed the instant petition for a writ of habeas corpus raising three claims.  First, Petitioner claims the prosecutor in his state case (hereinafter "Prosecutor") unlawfully used a peremptory challenge to remove an African-American prospective juror.  Second, Petitioner claims that the trial court erred by giving a jury instruction allowing a permissive inference of guilt, thereby lessening the prosecution's burden and denying Petitioner due process of law.  Third, Petitioner claims that his sentence under California's Three Strikes law constitutes cruel and unusual punishment in violation of the Eighth Amendment.

Respondent filed his Answer and Memorandum of Points and Authorities in Support of Answer to Petition for Writ of Habeas Corpus (hereinafter "Answer") on January 3, 2003 (docket nos. 7, 8).  Petitioner filed his Traverse and Memorandum of Points and Authorities in Support of Traverse (hereinafter "Traverse") on March 19, 2003 (docket no. 11).  The matter has been fully briefed and is now ready for review on the merits.

**II.    Statement of Facts**

The parties do not dispute the following facts, drawn from the appellate opinion.

2

1

2     Sherry Johnson, one of the victims in this case, testified about a series of
events that occurred on Saturday, February 21, 1998, which led to the brutal
3     beating of Shawn McElmore, who she described as her "boyfriend" for 15 years
and the father of her three children.  Around midnight Johnson and McElmore
4     walked from their residence on 11th Street in San Pablo to the 7-Eleven store at
San Pablo Avenue and Broadway to purchase some beer.  Johnson testified that
5     McElmore was already drunk, and they "argued the whole way there."

6     Appellants Vaughn and Ahmed were standing in front of the 7-Eleven
eating.  At one point during their argument, Johnson ripped McElmore's shirt and
7     then pulled it off him.  At this point, Johnson heard someone say something to
McElmore like, "It looks like you got your ass whooped."  Johnson entered the
8     7-Eleven store while McElmore remained outside.  Johnson stated that she exited
the store when she saw people running and it "clicked . . . that something was
9     going on" involving McElmore.  She saw McElmore engaged in a fistfight in the
7-Eleven parking lot.  At trial, Johnson identified appellants Ahmed and Vaughn,
10    whom she had never met before that evening, as two of the people McElmore was
fighting.  The fight quickly ended after Johnson came out of the store because a
11    San Pablo police car drove by and McElmore ran away.  Ahmed and Vaughn then
left the area in a green car.
12

13    McElmore then rejoined Johnson, and they began to walk home.  As they
walked, they saw the green car Vaughn and Ahmed were driving waiting at the
14    corner.  McElmore ran off and Johnson continued to walk.  Vaughn got out of the
car and confronted Johnson, asking her, "[W]here's that nigger at?  When we see
15    him, we're going to do him."  Johnson explained at trial that to "do" someone
means to "[f]ight, beat up, kill, whatever."  Johnson eventually entered the car and
16    drove around with Ahmed and Vaughn for approximately 20 minutes while they
looked for McElmore.[2]  Johnson intentionally directed them to places that she
17    knew McElmore would not be "to give him time to get back to the house."

18    Eventually, they pulled up in front of the residence Johnson and
McElmore shared with their three children.  Both appellants said, "There he is."
19    Johnson testified that by the time the car stopped, it was clear McElmore was
holding a sawed-off shotgun as it was in plain view.  Johnson testified Vaughn
20    and Ahmed "jumped out the car and ran towards [McElmore]."  After stealing a
CD player from appellants' car, Johnson testified she ran into the house, called
21    911, and "grabbed [her] kids."  Johnson came out of the house and found
McElmore lying face down in a pool of blood in the street.  He had been severely
22    beaten.

23    McElmore was taken to John Muir Hospital in such serious condition that
he was not expected to live.  He, however, survived.  At the time of trial, it was
24

25    _____

26       [2] Johnson testified that she was forced into the car by Vaughn putting his hand on her neck
and forcing her into the front passenger seat.  When Vaughn testified, he offered a different version
27    of events.  He explained that Johnson willingly went with them after they first agreed to take her to
an area where she could locate some drugs.  She indicated they could then take her home and
28    McElmore might be there.  The jury found Vaughn and Ahmed not guilty of kidnapping and instead,
convicted them of the lesser offense of false imprisonment in connection with these events.

United States District Court
For the Northern District of California

clear he had suffered severe, permanent brain damage, and was unable to talk, understand what is said to him, walk, or feed himself.  He receives sustenance through a tube inserted into his stomach, sleeps in a protective bed, and no further improvement in his cognitive or motor functioning is anticipated.  He will require 24-hour institutional care for the rest of his life.  McElmore was 32 years old at the time of the crime.

The defense consisted primarily of appellant Vaughn's testimony.  Ahmed did not testify at trial.  Vaughn indicated that the altercation with McElmore began at the 7-Eleven when McElmore walked up to him and asked "what the fuck was I looking at."  Vaughn testified he responded, "[W]hat the hell is your problem, you know, mad at me because you're getting your ass kicked by [Johnson]."  His testimony about the events that occurred thereafter did not differ significantly from Johnson's testimony other than to say that she went willingly with them.  Vaughn also contradicted Johnson's testimony by indicating that McElmore moved behind the car as they pulled up in front of the residence and that by the time McElmore pulled out the sawed-off shotgun, Vaughn was already out of the car and had "nowhere to go" to escape.  Vaughn also testified that as McElmore pulled out the weapon, he said, "I'm about to kill y'all."

Vaughn testified that he never intended to kill McElmore, at most he intended to have a fistfight with him, but that when McElmore pulled out the shotgun, he believed his choices were "[e]ither stand there and get shot or run and try and get the gun."  He decided to charge McElmore with all his strength and take the gun, and do his best to keep McElmore from getting the gun back and shooting him with it.  Vaughn testified his assault upon McElmore consisted of: 1) his elbow hitting McElmore in the face, 2) one swing of the side of the shotgun against his McElmore's face, and 3) Vaughn falling down upon McElmore with the shotgun hitting McElmore on the head as they hit the ground.  He testified that he had no idea how seriously injured McElmore was and that he took the gun after the altercation out of concern that McElmore not have it.

Vaughn's testimony was rebutted by the medical evidence.  Dr. Henry Turkel, Jr., one of the first doctors to treat McElmore upon his arrival to John Muir Hospital, testified that McElmore's injuries were "completely inconsistent" with the account given by Vaughn as to the manner in which McElmore's injuries were inflicted.  Dr. Turkel testified that in his medical opinion, probably between eight and ten blows were inflicted upon McElmore's head and face in order to cause such extensive injuries.  He described McElmore's face when he arrived at the emergency room as "just completely massively swollen . . . .  It was soft like a rotten melon. . . .  [I]t was unusually swollen and just mushy wherever you touched it."

After approximately two days of deliberation, the jury returned its verdict finding Vaughn and Ahmed guilty of false imprisonment of Johnson, a lesser offense of the charged crime of kidnapping.  Both Vaughn and Ahmed were found not guilty of the attempted murder charge, but Vaughn was convicted of the lesser offense of attempted voluntary manslaughter, with great bodily injury and deadly weapon use enhancements.  Both Vaughn and Ahmed were found guilty of second degree robbery for taking the shotgun from the scene.

People v. Ahmed, Nos. A086081/A086579, slip op. at 2-5 (Cal. Ct. App. July 31, 2001) (Resp't

4

1   Ex. C) (footnote renumbered).

2                                              **DISCUSSION**

3   **I.      Standard of Review**

4          Under the Antiterrorism and Effective Death Penalty Act of 1996 (hereinafter

5   "AEDPA"), a district court may grant a petition challenging a state conviction or sentence on

6   the basis of a claim that was reviewed on the merits in state court only if the state court's

7   adjudication of the claim: "(1) resulted in a decision that was contrary to, or involved an

8   unreasonable application of, clearly established federal law, as determined by the Supreme

9   Court of the United States; or (2) resulted in a decision that was based on an unreasonable

10  determination of the facts in light of the evidence presented in the [s]tate court proceeding."  28

11  U.S.C. § 2254(d).

12         "Clearly established federal law, as determined by the Supreme Court of the United

13  States" refers to "the holdings, as opposed to the dicta, of [the Supreme] Court's decisions as of

14  the time of the relevant state-court decision."  Williams (Terry) v. Taylor, 529 U.S. 362, 412

15  (2000); Lockyer v. Andrade, 538 U.S. 63, 71 (2003); Alvarado v. Hill, 252 F.3d 1066, 1068-69

16  (9th Cir. 2001).  Section 2254(d)(1) "restricts the source of clearly established law to [the

17  Supreme] Court's jurisprudence."  Williams, 529 U.S. at 412.

18         "Under the 'contrary to' clause, a federal habeas court may grant the writ if the state

19  court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of

20  law or if the state court decides a case differently than [the Supreme] Court has on a set of

21  materially indistinguishable facts."  Id. at 413.  "Under the 'unreasonable application' clause, a

22  federal habeas court may grant the writ if the state court identifies the correct governing legal

23  principle from [the Supreme] Court's decisions but unreasonably applies that principle to the

24  facts of the prisoner's case."  Id. at 412-13.

25         "[A] federal habeas court may not issue the writ simply because that court concludes in

26  its independent judgment that the relevant state-court decision applied clearly established

27  federal law erroneously or incorrectly.  Rather, that application must also be unreasonable."  Id.

28

United States District Court

For the Northern District of California

5

at 411.  The objectively unreasonable standard is not a clear error standard.  See Andrade, 538 U.S. at 63 (rejecting the Ninth Circuit's use of clear error standard in Van Tran v. Lindsey, 212 F.3d 1143 (9th Cir. 2000)).  After Andrade, "[t]he writ may not issue simply because . . . a state court's application of federal law was erroneous, clearly or otherwise."  Clark v. Murphy, 331 F.3d 1062, 1068 (9th Cir. 2003).  "While the 'objectively unreasonable' standard is not self-explanatory, at a minimum it denotes a greater degree of deference to the state courts than [the Ninth Circuit] ha[s] previously afforded them."  Id.

A federal habeas court may also grant the writ if it concludes that the state court's adjudication of the claim "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the [s]tate court proceeding."  28 U.S.C. § 2254(d)(2).  A district court must presume correct any determination of a factual issue made by a state court unless the petitioner rebuts the presumption of correctness by clear and convincing evidence.  28 U.S.C. § 2254(e)(1).  This presumption is not altered by the fact that the finding was made by a state court of appeals, rather than by a state trial court.  See Sumner v. Mata, 449 U.S. 539, 546-47 (1981); see also Bragg v. Galaza, 242 F.3d 1082, 1087 (9th Cir. 2001), amended by 253 F.3d 1150 (9th Cir. 2001).

Where, as here, the California Supreme Court denies review of Petitioner's claim without explanation, the Court looks to the last reasoned state court decision in conducting habeas review.  See Shackleford v. Hubbard, 234 F.3d 1072, 1079 & n.2 (9th Cir. 2000) (citation omitted), cert. denied, 534 U.S. 944 (2001) (the district court "looks through" the unexplained California Supreme Court decision to the last reasoned state court decision).  In the instant case, the California Court of Appeal rendered the last reasoned state court decision.

Habeas relief is warranted only if the constitutional error at issue is structural error or had a "substantial and injurious effect or influence in determining the jury's verdict."  Penry v. Johnson, 532 U.S. 782, 795 (2001) (quoting Brecht v. Abrahamson, 507 U.S. 619, 638 (1993)).  Under this standard, habeas petitioners may obtain plenary review of their constitutional claims, but they are not entitled to habeas relief based on trial error unless they can establish that it

resulted in "actual" prejudice.  <u>Brecht</u>, 507 U.S. at 637.

## II.   Exhaustion

Prisoners in state custody who wish to challenge collaterally in federal habeas proceedings either the fact or length of their confinement are required first to exhaust state judicial remedies, either on direct appeal or through collateral proceedings, by presenting the highest state court available with a fair opportunity to rule on the merits of each and every claim they seek to raise in federal court.  <u>See</u> 28 U.S.C. § 2254(b), (c); <u>Granberry v. Greer</u>, 481 U.S. 129, 133-34 (1987).  It is undisputed that Petitioner exhausted his state court remedies as to the claims raised in this proceeding.

## III.   Legal Claims

### A.   The *Batson*[3] Standard

#### 1.   Background

Petitioner claims that his Equal Protection rights were violated by the Prosecutor's use of a peremptory strike to excuse prospective juror Reginald H. (hereinafter "Juror No. 10"), an African-American man.  (Pet'r App. A at 3.)  The appellate opinion summarized the facts as follows:

> Here, appellant Ahmed made a *Wheeler* motion[4] after the prosecutor exercised a peremptory challenge against Juror No. 10, an African-American. Appellant Vaughn joined in the motion.  The record reflects that at the time the prospective African-American juror was peremptorily challenged by the prosecution, there was an African-American in the jury box, an African-American in the courtroom awaiting voir dire, and several other African-Americans remaining outside the courtroom and waiting to enter if a jury was not impaneled.  Defense counsel indicated that race was the only apparent reason for the challenge because the prospective juror did not "give any answers that were out of the ordinary, unusual, or in any way would indicate that he could not sit and be a fair and impartial juror in this matter."

Resp't Ex. C at 7 (footnote added).

---

[3]  <u>Batson v. Kentucky</u>, 476 U.S. 79 (1986).

[4]  In California, a party who believes his opponent is using his peremptory challenges to strike jurors on grounds of group bias alone may raise the point by way of a timely <u>Wheeler</u> motion. <u>See</u> <u>People v. Wheeler</u>, 22 Cal. 3d 258, 280 (1978).

United States District Court
For the Northern District of California

The trial court made a finding that Petitioner had failed to establish a prima facie case.

The court stated:

> All right, I'm reviewing the questionnaire filled out by [Juror No. 10]. Give me just a moment.
>
> All right, I have reviewed the entire questionnaire, and I also don't recall exactly how many members of our second group, if you will, who are waiting outside to be brought in, are African American. I noted that we had several in the initial group, one is seated on the jury now, and we have gone through a number of challenges, and that juror has not been challenged. Although the case that has been cited allows that one challenge of one person of color, or other protected class being challenged, is sufficient to make a <u>Wheeler</u> motion, I think that there has to be that prima facie showing that, in fact, the questioned challenge was race based. There may be a variety of reasons why that juror was challenged. I don't know whether his having sat on an attempted murder jury before, or any of the other responses, was the basis for the challenge. But in order to grant a <u>Wheeler</u>, or to actually make the initial finding and request an explanation from the People, requires a finding by the Court that there's a prima facie showing that the challenge was race based. The fact that [Juror No. 10] is African American, that alone, I don't think is sufficient to show that the challenge is race based. There has to be some other indication. And I think the fact that we have one other African American on the -- seated on the jury now and who has not been challenged through several passes by the People, I think there have been three passes since that juror was seated, does not support the allegation that this was race based. So I don't find at that juncture that there's sufficient basis for the prima facie showing, and I'll deny the <u>Wheeler</u> motion.

RT 160-161.

The appellate court reviewed Petitioner's <u>Batson</u> claim in an unpublished opinion.

According to the appellate court:

> Ahmed and Vaughn each contend "the prosecutor systematically exercised [a] peremptory challenge to remove an African-American man from sitting on appellant's jury in violation of appellant's state and federal constitutional rights." The People counter that, "[w]hile it is theoretically possible that a single challenge to a prospective juror might be racially motivated, a defendant is hard-pressed to establish the prosecutor 'systematically exercised his peremptory challenge' . . . to exclude members of a group where only one challenge is made, other members of the group serve on the jury, and the victims are members of the same group."
>
> "Under *Wheeler* and *Batson* [i]f a party believes his opponent is using his peremptory challenges to strike jurors on the ground of group bias alone, he must raise the point in timely fashion and make a prima facie case of such discrimination to the satisfaction of the court. First, . . . he should make as complete a record of the circumstances as is feasible. Second, he must establish that the persons excluded are members of a cognizable group. . . . Third, from all the circumstances of the case he must show a strong likelihood that such persons are being challenged because of their group association. [Citations.] [¶]

If the trial court finds that [he] has established a prima facie case, the burden shifts to [his opponent] to provide a race-neutral explanation related to the particular case to be tried for the peremptory challenge. [Citation.]" (*People v. Welch* (1999) 20 Cal.4th 701, 745 [internal quotations omitted].) In this case, the burden never shifted to the prosecutor to explain her use of the peremptory challenge because the trial court found appellants failed to set forth a prima facie case of purposeful discrimination. This ruling is challenged on appeal.

In order to set forth a prima facie case of purposeful discrimination, the objecting party must show, from all the circumstances of the case, a "strong likelihood" that persons are being challenged because of their group association rather than because of any specific bias. (*Wheeler*, *supra*, 22 Cal.3d at p. 280.) The appropriate standard of prima facie proof is described in *Batson*, *supra*, 476 U.S. at p. 96, as "raising an inference" of improper use of challenges. While appellants argue these formulations for setting forth a prima facie case constitute different standards, and that the "strong likelihood" standard should yield to the "raising an inference" standard, our high court has recently clarified that the standards set forth in *Wheeler* and *Batson* are equivalent. (*People v. Box* (2000) 23 Cal.4th 1153, 1188, fn. 7 ["in California, a 'strong likelihood' means a 'reasonable inference'"].)

Appellate courts review trial court's rulings on *Wheeler* motions for substantial evidence. (*People v. Alvarez* (1996) 14 Cal.4th 155, 196-197.) Because such motions call upon trial judges' personal observations, an appellate court will review their rulings with considerable deference. (*People v. Rodriguez* (1999) 76 Cal.App.4th 1093, 1112-1113.) "When a trial court denies a *Wheeler* motion because it finds no prima facie case of group bias was established, the reviewing court considers the entire record of voir dire." (*People v. Davenport* (1995) 11 Cal.4th 1171, 1200.) "If the record 'suggests grounds upon which the prosecutor might reasonably have challenged' the jurors in question, we affirm." (*People v. Howard* (1992) 1 Cal.4th 1132, 1155; *People v. Garceau* (1993) 6 Cal.4th 140, 171-172.)

Here, appellant Ahmed made a *Wheeler* motion after the prosecutor exercised a peremptory challenge against Juror No. 10, an African-American. Appellant Vaughn joined in the motion. The record reflects that at the time the prospective African-American juror was peremptorily challenged by the prosecution, there was an African-American in the jury box, an African-American in the courtroom awaiting voir dire, and several other African-Americans remaining outside the courtroom and waiting to enter if a jury was not impaneled. Defense counsel indicated that race was the only apparent reason for the challenge because the prospective juror did not "give any answers that were out of the ordinary, unusual, or in any way would indicate that he could not sit and be a fair and impartial juror in this matter."

The trial court made a finding that appellants had failed to establish a prima facie case. The court noted that the prosecutor passed the jury repeatedly with an African-American on the panel who was now seated on the jury. The trial court also found there were reasons that the challenged juror could be eliminated based on his responses. Specifically, the prospective juror had previously served as a juror in an attempted murder case. The prosecutor then noted for the record that she had made six challenges, five of which were to prospective Caucasian jurors, and that this was her first challenge to an

9

United States District Court
For the Northern District of California

1    African-American.

2         We find no error in the trial court's decision to deny the motion for lack
3    of an adequate prima facie showing of group bias.  To satisfy the burden of
     proving a "prima facie case of such discrimination to the satisfaction of the
4    court," the moving party must "make as complete a record of the circumstances
     as is feasible," and "show a strong likelihood" that excluded persons in a
5    cognizable group "are being challenged because of their group association rather
     than because of any specific bias."  (*People v. Trevino* (1997) 55 Cal.App.4th
6    396, 403, citations, quotation marks, and fn. omitted; see also *People v. Fuentes*
     (1991) 54 Cal.3d 707, 714.)  "Although there is no exhaustive list of
7    circumstances which a court should consider when determining whether a party
     has made a prima facie showing of purposeful discrimination, there are several
8    factors which the courts have said can be considered:  [¶] 1) Whether most or all
     of the members of the identified group from the venire are challenged, or use of a
9    disproportionate number of peremptories against the group.  [Citation.]  [¶] 2)
     Whether the jurors in question share only one characteristic -- their membership
10   in the group; otherwise they are heterogeneous 'as the community as a whole.'
     [Citation.]  [¶] 3) Whether the challenging party fails to engage in more than
11   desultory voir dire of the challenged jurors or asks them no questions at all.
     [Citation.]  [¶] 4) Whether the defendant is a member of the group allegedly
12   discriminated against and the victim is a member of the group to which the
     majority of remaining jurors belong.  [Citation.]  [¶] 5) Whether members of the
13   group allegedly discriminated against were challenged by the moving party.
     [Citation.]  [¶] 6) The extent to which the jury included members of the group
14   allegedly discriminated against.  [Citations.]"  (*People v. Trevino*, *supra*, at pp.
     403-404.)

15
16        A consideration of these factors persuades us that appellants have not
     established an inference of group bias.  While appellant Vaughn belonged to the
17   same racial group as the challenged prospective juror, so did both of the victims.
     Moreover, the fact that the prosecutor did not challenge an African-American
18   juror who remained on the jury is evidence that the prospective juror was
     challenged for reasons other than his race.  "While the fact that the jury included
19   members of a group allegedly discriminated against is not conclusive, it is an
     indication of good faith in exercising peremptories, and an appropriate factor for
20   the trial judge to consider in ruling on a *Wheeler* objection.  [Citations.]"
     (*People v. Turner* (1994) 8 Cal.4th 137, 168.)  Further, a race-neutral reason for
21   the challenge to the African-American prospective juror was noted by the trial
     court, specifically, that he had previously served as a juror in a similar case.
22   Furthermore, his mother had lived in San Pablo, where the crime took place, for
     approximately 25 years.  The prospective juror testified he visited his mother
23   regularly.  Finally, appellants did not make any effort to set out other pertinent
     "circumstances, such as the prospective jurors' individual characteristics, the
24   nature of the prosecutor's voir dire, or the prospective jurors' answers to
     questions" in attempting to establish a prima facie case.  (*People v. Howard*,
25   *supra*, 1 Cal.4th at p. 1154.)  For all of the above reasons we conclude that
     substantial evidence supports the trial court's finding that appellants did not
26   make a prima facie showing that the prosecution's challenges were the result of
     group bias.

27
     Resp't Ex. C at 5-8.
28

                                    10

United States District Court
For the Northern District of California

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

To support his Batson claim, Petitioner argues that the trial court's use of Wheeler's "strong likelihood" test was erroneous for purposes of determining whether Petitioner had established a prima facie case under Batson.  Petitioner also argues that the appellate court's decision was contrary to or an unreasonable application of federal law because the appellate court relied on the trial court's use of an erroneous standard in its determination that Petitioner had failed to establish a prima facie case.  (Traverse at 7.)

## 2.    Applicable Federal Law

The use of peremptory challenges to exclude members of a cognizable racial group from a jury is prohibited under the Sixth and Fourteenth Amendments.  Batson, 476 U.S. at 89.  The prima facie showing is the first step of Batson's "three-step process for evaluating a claim that a prosecutor has exercised peremptory challenges in a racially-discriminatory manner."  Paulino v. Castro, 371 F.3d 1083, 1089 (9th Cir. 2004).  To establish a prima facie case, Petitioner must show that (1) the prospective juror who was removed is a member of a cognizable group, (2) the prosecutor exercised a peremptory challenge to remove the juror, and (3) "the facts and any other relevant circumstances raise an inference" that the challenge was motivated by race or gender.  Cooperwood v. Cambra, 245 F.3d 1042, 1046 (9th Cir. 2001); see Batson, 476 U.S. at 96.  Although a pattern of strikes against a cognizable group may support an inference of discrimination, a court must consider all the relevant circumstances surrounding a peremptory challenge.  See Tolbert v. Page, 182 F.3d 677, 682 (9th Cir. 1999).  If the defendant establishes a prima facie case, "'the burden shifts to the State to explain adequately the racial exclusion' with race-neutral reasons" for the peremptory challenge.  Paulino, 371 F.3d at 1089 (quoting Batson, 476 U.S. at 94).  Only then does the trial court "determine whether the defendant has established purposeful discrimination."  Id.  If the defendant fails to establish a prima facie case, then the motion was properly denied and the prosecutor need not provide a race-neutral explanation for the strike.  See Batson, 476 U.S. at 96-97; Cooperwood, 245 F.3d at 1046.

The prima facie showing is the first step of Batson's three-step process.  See Paulino, 371 F.3d at 1089.  A "prima facie inquiry involves a mixed question of law and fact, because

11

United States District Court
For the Northern District of California

1  the court must determine whether the facts are sufficient to meet the requirements of the legal

2  rule and, therefore, to proceed to the ensuing steps of the <u>Batson</u> analysis." <u>Tolbert</u>, 182 F.3d at

3  681.  Although a petitioner "can make a prima facie showing based on statistical disparities

4  alone," <u>Paulino</u>, 371 F.3d at 1091; <u>see also</u> <u>Williams v. Woodford</u>, 306 F.3d 665, 682 (9th Cir.

5  2002), there is no magic number of challenged jurors which automatically establishes a prima

6  facie case of discrimination.  <u>See</u> <u>United States v. Chinchilla</u>, 874 F.2d 695, 698 (9th Cir. 1989).

7       It is well established that when deciding whether a petitioner has made a prima facie

8  showing, "the trial court must consider the totality of [the] relevant circumstances." <u>Tolbert v.</u>

9  <u>Gomez</u>, 182 F.3d 985, 988 (9th Cir. 1999).  Whether or not all the relevant circumstances raise

10  a reasonable inference of discrimination will depend on factors such as the attitude and behavior

11  of the challenging attorney and the prospective jurors manifested during voir dire as well as the

12  trial judge's observation of critical events.  <u>See</u> <u>id.</u>  As a practical matter, the trial judge is in a

13  unique position to personally witness the totality of circumstances that comprises the factual

14  inquiry, including the jurors' demeanor and tone of voice as they answer questions, and

15  counsels' demeanor and tone of voice in posing the questions.  <u>See</u> <u>id.</u>  The trial judge is able to

16  observe a juror's attention span, alertness, and interest in the proceedings and thus will have a

17  sense of whether the prosecutor's challenge can be readily explained by a legitimate reason.  <u>See</u>

18  <u>id.</u>  The trial court also has access to other information about the venire pool that often does not

19  show up in the record on appeal -- such as juror age, residence, and employment.  <u>See</u> <u>id.</u>

20

21       To succeed on his <u>Batson</u> claim, Petitioner must establish a reasonable inference of

22  racial motivation in the Prosecutor's challenge of Juror No. 10.  <u>See</u> <u>Batson</u>, 476 U.S. at 96.

23  The Court finds that the first and second steps of the <u>Batson</u> prima facie case have been met: (1)

24  Juror No. 10 was an African-American and, therefore, from a cognizable group; and (2) the

25  Prosecutor used a peremptory strike against Juror No. 10.  <u>See</u> <u>Cooperwood</u>, 245 F.3d at 1047-

26  48; <u>Batson</u>, 476 U.S. at 96.  Because the Court has determined that Petitioner has met the first

27  two steps, the Court will limit its inquiry to the third step of the prima facie case, that is,

28  whether the relevant circumstances raise a reasonable inference that Juror No. 10 was stricken

1    on the basis of race.[5]

2         **3.    Analysis**

3              a.    **Trial Court's Erroneous Use of *Wheeler*'s Strong Likelihood**
                     **Standard**
4

5         A review of the record indicates that the state courts failed to recognize that the strong

6    likelihood standard in Wheeler was not synonymous with Batson's reasonable inference

7    standard at the time Petitioner's conviction became final.  See Paulino, 371 F.3d at 1090

8    ("California courts in following the 'strong likelihood' language of Wheeler are not applying the

9    correct legal standard for a prima facie case under Batson." (quoting Wade v. Terhune, 202 F.3d

10   1190, 1197 (9th Cir. 2000))).  Because the Court finds that the appellate court employed the

11   incorrect legal standard in reviewing Petitioner's claim, the Court will examine his claim de

12   novo.

13        The Court would normally be required to defer to the appellate court's factual finding

14   that there was no prima facie showing of bias.  See Paulino, 371 F.3d at 1090 (citing Tolbert,

15   182 F.3d at 682).  De novo review applies to a Batson claim where the state appellate court

16   employed the incorrect legal standard in determining whether the defendant had established a

17   prima facie case.  Id.  The application of de novo review is based on the Ninth Circuit's holding

18   that California's Wheeler standard for establishing a prima facie case is more stringent than the

19   Batson standard because it requires a defendant to show a strong likelihood rather than a

20   reasonable inference that the jurors were stricken on the basis of race.  See id. (citing Wade, 202

21   F.3d at 1197).

22        The Ninth Circuit held in Cooperwood, that de novo review applied where the state

23

24   ────────────────

25        [5]  The Court finds that only the initial step of the Batson claim, which involves establishing a
     prima facie case, is under review.  The trial court had already determined that Petitioner had not
26   established a prima facie case, therefore, the burden never shifted to the Prosecutor to articulate a
     race-neutral explanation for using a peremptory strike against Juror No. 10.  Nor was the trial court
27   required to assess the Prosecutor's explanations for why she challenged the stricken juror.
     Therefore, the Court will address only the preliminary issue of whether Petitioner made a prima
28   facie showing that the relevant circumstances gave rise to a reasonable inference that the Prosecutor
     exercised her peremptory challenge on the basis of race.

court employed <u>Wheeler</u>'s strong likelihood standard in cases prior to <u>People v. Box</u>, 23 Cal. 4th 1153 (2000).[6]  <u>See Cooperwood</u>, 245 F.3d at 1046.  The Ninth Circuit so held because it found that during the period between the California state courts' decisions in <u>People v. Bernard</u>, 27 Cal. App. 4th 458 (Ct. App. 1994), and <u>Box</u>, 23 Cal. 4th 1153, California state courts were applying the <u>Wheeler</u> strong likelihood standard in a more stringent manner than the <u>Batson</u> reasonable inference standard.  <u>Cooperwood</u>, 245 F.3d at 1046-47 ("California state courts have applied a lower standard of scrutiny to peremptory strikes than the Federal Constitution permits." (quoting <u>Wade</u>, 202 F.3d at 1196-97)).

Here, Petitioner's state trial occurred in 1998 -- before <u>Box</u> was issued.  The trial court found that Petitioner failed to establish a prima facie case that the Prosecutor's use of a peremptory challenge amounted to a equal protection violation.  In concluding that Petitioner failed to establish a prima facie case, the trial court determined that the fact that Juror No. 10 belonged to a cognizable group alone was not sufficient to show that the challenge was race-based and implicitly required Petitioner needed to show "some other indication" that Juror No. 10 was being challenged under <u>Wheeler</u>.  RT 161.

The appellate court denied Petitioner's direct appeal in 2001 -- after <u>Box</u> was issued.  In affirming the trial court's denial of Petitioner's prima facie claim, however, the appellate court did not clearly indicate that it was applying a reasonable inference test consonant with <u>Batson</u>.  The appellate court implied that it used the proper standard for demonstrating bias:

> The appropriate standard of prima facie proof is described in *Batson*, *supra*, 476 U.S. at 96, as "raising an inference" of improper use of challenges.  While appellants argue these formulations for setting forth a prima facie case constitute different standards, and that the "strong likelihood" standard should yield to the "raising an inference" standard, our high court has recently clarified that the standards set forth in *Wheeler* and *Batson* are equivalent.

---

[6]  In <u>Box</u>, the California Supreme Court held that <u>Wheeler</u> and <u>Batson</u> applied the same standards to peremptory challenges and were interchangeable.  <u>Box</u>, 23 Cal. 4th at 1188.  The California Supreme Court has since concluded in <u>People v. Johnson</u>, 30 Cal. 4th 1302, 1313 (2003), that <u>Wheeler</u>'s "strong likelihood" standard is and always has been the same as the reasonable inference standard found in <u>Batson</u>.  The Ninth Circuit has nonetheless held in <u>Cooperwood</u> that de novo review applies to cases tried prior to 2000, when <u>Box</u> was decided, in which trial courts were following <u>Wheeler</u>'s "strong likelihood" standard.  <u>Cooperwood</u>, 245 F.3d at 1047.

14

United States District Court
For the Northern District of California

Resp't Ex. C at 6 (citing <u>Box</u>, 23 Cal. 4th at 1188 n.12 ["in California, a 'strong likelihood'
means a 'reasonable inference'"]).

Even if the appellate court correctly identified the <u>Batson</u> standard as the "appropriate
standard of prima facie proof," the appellate court clearly applied the <u>Wheeler</u> "strong
likelihood" standard in their analysis:

> To satisfy the burden of proving a "prima facie case of such discrimination to the
> satisfaction of the court," the moving party must "make as complete a record of
> the circumstances as is feasible," and "show a <u>strong likelihood</u>" that excluded
> persons in a cognizable group "are being challenged because of their group
> association rather than because of any specific bias."  [Citation.]

Resp't Ex. C at 7-8 (emphasis added).  Thus, the process employed by the appellate court to
evaluate Petitioner's claim contravened the required procedure to establish a prima facie case
outlined in <u>Batson</u>.  <u>See</u> <u>Paulino</u>, 371 F.3d at 1090.  Because the appellate court's factual finding
-- that there was no prima facie showing of bias --  is not entitled to a presumption of
correctness due to the erroneous application of <u>Wheeler</u>'s strong likelihood standard, the Court
will conduct a de novo review of the record using <u>Batson</u>'s reasonable inference standard.  <u>See</u>
<u>Caliendo v. Warden of Cal. Men's Colony</u>, 365 F.3d 691 (9th Cir. 2004) (declining to apply
presumption where state court incorrectly placed the burden of proof on the defendant rather
than the government).  The burden still lies with Petitioner to show that there was a reasonable
inference that Juror No. 10 was stricken on the basis of race, in order to establish a prima facie
case under <u>Batson</u>.  <u>See</u> <u>Wade</u>, 202 F.3d at 1192.

### b.    De Novo Review

Upon careful review of the record, the Court finds that the relevant circumstances did
not raise a reasonable inference that the Prosecutor used a peremptory challenge to exclude
Juror No. 10 on account of his race.

Petitioner asserts that Juror No. 10 was a "venire person attractive to the prosecution."
(Pet'r App. A at 8.)  Petitioner supports this assertion with Juror No. 10's answers during voir
dire including: his past history as a robbery victim (and his satisfaction with the investigation of

15

that robbery); his prior service as a juror in an attempted murder trial; and his willingness to be a fair and impartial juror.  (Id.)  Petitioner argues that these facts raise a reasonable inference that Juror No. 10 was challenged by the Prosecutor because of his race.  (Id.)

Respondent argues that Juror No. 10's experience as a robbery victim and his prior jury service were valid reasons supporting a non-racial challenge by the Prosecutor.  (Answer at 11.)  Respondent also claims that Juror No. 10's familiarity with the streets of San Pablo was another possible non-racial reason for the Prosecutor's challenge.

Here, considering the totality of the relevant circumstances surrounding the Prosecutor's strike of Juror No. 10, the Court finds that the record does not indicate that the peremptory challenge at issue in this case raises a reasonable inference of racial discrimination.[7]  A review of the entire voir dire record indicates that Juror No. 10 was posed questions similar in nature to those posed to other potential jurors, including questions relating to past experiences as a victim of a crime, past interactions with law enforcement, previous jury service, and familiarity with the San Pablo area.  As such, the trial judge was in the unique position of personally evaluating Juror No. 10's answers along with the answers of all other prospective jurors and all the relevant circumstances surrounding those answers.

First, the trial judge acknowledged the presence of one other African-American seated on the jury who was not challenged by the prosecution.  RT 160-161.  Turning to Juror No. 10's questionnaire and his answers at voir dire, the trial judge determined that Juror No. 10's responses could have formed the basis for the Prosecutor's challenge.  RT 161.  Juror No. 10 served as a juror on an attempted murder case.  RT 161.  Furthermore, Juror No. 10's mother lived in San Pablo for over twenty-five years, and he visited with her "once every couple of weeks or so."[8]  ART 202-203.

---

[7] Because the record does not include Juror No. 10's answers to the juror questionnaire, the Court makes its determination based on the voir dire transcript and the trial court's findings.

[8] The Prosecutor expressed her concern that Juror No. 10 might be inclined to visit the scene of the crime because his mother lived in the area.  ART 202-203.  This concern was not specific to Juror No. 10 and not a pretext for a race-based challenge, as another juror, Juror No. 3, was

United States District Court

For the Northern District of California

The Court is well-aware that it is not in the same unique position as the trial judge to evaluate the totality of the relevant circumstances, including counsels' demeanor and tone of voice, as well as Juror No. 10's demeanor, tone of voice, attention span, alertness, and interest in the proceedings.  However, the Court is convinced that Juror No. 10's answers to his questionnaire and voir dire responses formed the basis for a reasonable prosecutorial challenge that was not race-based.  The trial judge's evaluation of the totality of the relevant circumstances, including the presence of one other African-American seated on the jury and the potential non-racial reasons that could reasonably be gleaned from Juror No. 10's answers, do not support Petitioner's claim that the Prosecutor systematically exercised a race-based peremptory challenge.[9]

In sum, upon conducting a de novo review of the record, the Court finds that Petitioner failed to establish that the Prosecutor's peremptory challenge raises a reasonable inference of bias.

Accordingly, Petitioner has not stated a valid <u>Batson</u> claim on which habeas relief can be granted.

**B.    Erroneous Jury Instruction**

**1.    Background**

Petitioner claims that the trial court erred by instructing the jury pursuant to CALJIC No. 2.15, California's pattern jury instruction concerning possession of stolen property.  (Pet. at 5.)  He claims this instruction "impermissibly lessened the prosecution's burden of proof," thereby denying Petitioner due process of law.  (Pet'r. App. A at 10.)

//

---

challenged for cause primarily due to his familiarity with the streets of San Pablo.  ART 217-218, 246.

[9]  Petitioner's contention that the challenged juror was "attractive" to the prosecution does not compel a different conclusion because the record indicates that there were indeed race-neutral reasons for the Prosecutor's decision to remove Juror No. 10.  <u>See</u> <u>Tolbert</u>, 190 F.3d at 989; <u>see also</u> <u>Wade</u>, 202 F.3d at 1198 (noting that "entirely plausible reasons, independent of race," for striking a juror support a finding that the prosecutor did not act based on racial bias).

2.   **Applicable Federal Law**

A challenge to a jury instruction solely as an error under state law does not state a claim cognizable in federal habeas corpus proceedings.  See Estelle v. McGuire, 502 U.S. 62, 71-72 (1991).  To obtain federal collateral relief for errors in the jury charge, a petitioner must show that the ailing instruction by itself so infected the entire trial that the resulting conviction violates due process.  See Estelle, 502 U.S. at 72; Cupp v. Naughten, 414 U.S. 141, 147 (1973). The instruction may not be judged in artificial isolation, but must be considered in the context of the instructions as a whole and the trial record.  See Estelle, 502 U.S. at 72.  In other words, the court must evaluate jury instructions in the context of the overall charge to the jury as a component of the entire trial process.  United States v. Frady, 456 U.S. 152, 169 (1982) (citing Henderson v. Kibbe, 431 U.S. 145, 154 (1977)); Prantil v. California, 843 F.2d 314, 317 (9th Cir.), cert. denied, 488 U.S. 861 (1988).  Finally, the defined category of infractions that violate fundamental fairness is very narrow:  "Beyond the specific guarantees enumerated in the Bill of Rights, the Due Process Clause has limited operation."  Estelle, 502 U.S. at 73.

The Due Process Clause of the Fourteenth Amendment protects the accused against conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he or she is charged.  See In re Winship, 397 U.S. 358, 364 (1970).  This constitutional principle prohibits the State from using evidentiary presumptions in a jury charge that have the effect of relieving the State of its burden of persuasion beyond a reasonable doubt of every essential element of a crime.  See Yates v. Evatt, 500 U.S. 391, 400-03 (1991); Carella v. California, 491 U.S. 263, 265-66 (1989); Francis v. Franklin, 471 U.S. 307, 313 (1985); Sandstrom v. Montana, 442 U.S. 510, 520-24 (1979).  Failure to properly instruct the jury on the necessity of proof beyond a reasonable doubt "can never be harmless error."  Gibson v. Ortiz, 387 F.3d 812, 825 (9th Cir. 2004) (quoting Jackson v. Virginia, 443 U.S. 307, 320 n.14 (1979)).  "When a court gives the jury instructions that allow it to convict on an impermissible legal theory, as well as a theory that meets constitutional requirements, 'the unconstitutionality of any of the theories requires that the conviction be set aside.'"  Id. (citing Boyde v. California,

18

United States District Court
For the Northern District of California

1    494 U.S. 370, 379-80 (1990)).

2          The State, however, is not precluded from adopting a rule that makes it easier for the

3    State to meet the requirement of proof beyond a reasonable doubt unless the rule itself shifts or

4    reduces the burden of proof or otherwise violates a fundamental principle of fairness and

5    therefore violates the Due Process Clause.  See Montana v. Egelhoff, 518 U.S. 37, 54-55

6    (1996).

7          The first step in analyzing whether an instruction that creates an evidentiary inference

8    violates due process by relieving the State of its burden of proving each element of a crime

9    beyond a reasonable doubt is to determine whether the instruction creates a mandatory

10   presumption or a permissive inference.  See United States v. Warren, 25 F.3d 890, 897 (9th Cir.

11   1994).  "A mandatory presumption instruction tells the jury that it must presume that an element

12   of a crime has been proven if the government proves certain predicate facts."  Id.  By contrast,

13   "a permissive inference instruction allows, but does not require, a jury to infer a specified

14   conclusion if the government proves certain predicate facts."  Id.

15         Courts "determine the constitutionality of a permissive inference instruction on a case-

16   by-case basis" by reviewing the record evidence to see if the court can say with substantial

17   assurance that the inferred fact flows more probably than not from the facts proven in the

18   particular case.  See Warren, 25 F.3d at 898; see, e.g., County Court of Ulster County v. Allen,

19   442 U.S. 140, 162-67 (1979) (finding instruction constitutional only after concluding that

20   inference more probably than not flowed from specific facts proven to jury at trial).

21         Permissive inference instructions generally are disfavored because they tend to take the

22   focus away from the elements that must be proved.  See Hanna v. Riveland, 87 F.3d 1034, 1037

23   (9th Cir. 1996).  Such instructions are less objectionable if other instructions condition, qualify

24   or explain them.  See id. at 1038.  However, a passing reference in the instructions to "consider

25   all evidence" will not cure a defect where a jury is entitled to convict by focusing on a few

26   isolated facts.  See id.

27         If the inference instruction violated the petitioner's right to due process, the petitioner

28

19

can only obtain relief if the unconstitutional inference instruction resulted in actual prejudice under Brecht, 507 U.S. at 637-38.  See Patterson v. Gomez, 223 F.3d. 959, 967-68 (9th Cir. 2000); Hanna, 87 F.3d at 1039.  Actual prejudice exists if the unconstitutional instruction had a "substantial influence on the conviction."  Id.

### 3. **Analysis**

The trial court read CALJIC No. 2.15 to the jury as follows:

> If you find that a defendant was in conscious possession of recently stolen property[,] the fact of that possession is not by itself sufficient to permit an inference that a defendant is guilty of the crime of robbery.  Before guilt may be inferred there must be corroborating evidence tending to prove a defendant's guilt.  However, this corroborating evidence need only be slight, and need not by itself be sufficient to warrant an inference of guilt.
>
> As corroboration[,] you may consider the attributes of possession, time, place and manner, that a defendant had an opportunity to commit the crime charged, a defendant's conduct, his false or contradictory statements, if any, and/or any other statements he may have made with reference to the property, and any other evidence which tends to connect the defendant with the crime charged.

RT 1355-1356.

Petitioner argues that CALJIC No. 2.15 denied him due process of law because the jury would understand the instruction to mean the following: if the Prosecutor proved he was in constructive possession of stolen property, then only "slight" corroborative evidence was necessary to convict him of robbery.[10]  (Pet'r App. A at 10-11.)  Petitioner thus claims that this jury instruction undermined "the factfinder's responsibility at trial, based on evidence adduced by the State, to find the ultimate facts beyond a reasonable doubt.  [Citation.]"  (Id. at 11.)

The appellate court rejected Petitioner's claim that this instruction constituted a denial of due process of law as follows:

> Appellant Ahmed, joined by appellant Vaughn, next claims the court committed prejudicial error in instructing the jury that "conscious possession of recently stolen property," together with "slight" corroborating evidence, can justify an inference of guilt for the crime of robbery.  Appellants make the

---

[10]  At trial, the defense argued that Petitioner "did not participate in the robbery, either as a principal or as aider and abettor, thus his possession of the weapon was not evidence which a robbery conviction could be based."  (Pet'r App. A at 14.)

20

1    following argument: "By coupling an ultimate inference of guilt with a
     requirement of proof by only 'slight evidence,' CALJIC No. 2.15 impermissibly
2    lessened the prosecution's burden of proof."

3           This contention was specifically rejected in *People v. Holt* (1997) 15
     Cal.4th 619.  In that case CALJIC No. 2.15 was given with reference to burglary
4    and robbery.  The defendant argued that the jury would understand the
     instruction to mean it could convict him of burglary and robbery, based upon a
5    finding that he possessed stolen property and slight corroborating evidence,
     without finding the other "foundational facts" necessary to prove robbery and
6    burglary.  (*Id.* at p. 677.)  The court stated: "The jury was advised that the
     instructions were to be considered as a whole and each in the light of all the
7    others.  It was also instructed on all the required elements of burglary and
     robbery and was expressly told that in order to prove those crimes, each of the
8    elements must be proved.  We see no possibility that giving the jury the
     additional admonition that it could not rely solely on evidence that defendant
9    possessed recently stolen property would be understood by the jury as suggesting
     that it need not find all of the statutory elements of burglary and robbery had
10   been proven beyond a reasonable doubt." (*Ibid.*; see also *People v. Johnson*
     (1993) 6 Cal.4th 1, 37-38.)  In this case, as in *Holt*, the jury was instructed on all
11   the elements of the offenses referenced in the instructions, and given the standard
     instructions on the necessity of finding each element.
12

13          With respect to appellants' specific contention that CALJIC No. 2.15
     lessens the prosecution's burden of proof, several courts have upheld CALJIC
14   No. 2.15 in response to similar arguments.  In *People v. Gamble* (1994) 22
     Cal.App.4th 446, 454-455, the court rejected the contention, "that CALJIC No.
15   2.15 violated due process by lessening the prosecutor's burden of proving every
     element of robbery beyond a reasonable doubt," and the instruction is misleading
16   as to the burden of proof and conflicts with the reasonable doubt instructions.
     The court held: "[t]he instruction creates only a permissive inference, one the
17   jury could either credit or reject 'based on its evaluation of the evidence, and
     therefore does not relieve the People of any burden of establishing guilt beyond a
18   reasonable doubt. [Citation.]' [Citation.]  A permissive inference does not shift
     the prosecution's burden of proof, and violates due process 'only if the suggested
19   conclusion is not one that reason and common sense justify in light of the proven
     facts before the jury.' [Citations.]"  (*Ibid.*; accord, *People v. Esquivel* (1994) 28
20   Cal.App.4th 1386, 1400-1401.)  In *People v. Hernandez* (1995) 34 Cal.App.4th
     73, 81, the defendant argued that CALJIC No. 2.15 "undercut the presumption of
21   innocence because it permitted the jury to convict him on the basis of *slight*
     evidence." (Italics added.)  The court rejected the argument, reasoning that
22   CALJIC No. 2.15 only describes an inference that may be drawn from the
     evidence, and does not purport to modify or lessen the ultimate burden of proof.
23   (*Ibid.*)  Based on the foregoing authority, we conclude the trial court did not err
     in giving CALJIC No. 2.15.
24

25   Resp't Ex. C at 14-15.

26          Petitioner claims that the case against him was "primarily based on circumstantial

27   evidence regarding [his] possession of McElmore's sawed-off shotgun."  (Pet'r App. A at 13-

28   14.)  Petitioner asserts that the trial court lessened the prosecution's burden of proving its case

United States District Court

For the Northern District of California

21

United States District Court
For the Northern District of California

1  against him beyond a reasonable doubt by reading CALJIC No. 2.15 to the jury.  (Id. at 13.)

2  The appellate court rejected this argument.

3      The Court finds the appellate court's decision was not an unreasonable application of

4  Supreme Court law under Barnes v. United States, 412 U.S. 837 (1973).  In Barnes, the United

5  States Supreme Court stated that "[f]or centuries courts have instructed juries that an inference

6  of guilty knowledge may be drawn from the fact of unexplained possession of stolen goods."

7  Id. at 843.  The Court in Barnes found that such an inference comported with due process if "the

8  evidence necessary to invoke the inference is sufficient for a rational juror to find the inferred

9  fact beyond a reasonable doubt . . . ."[11]  Id.  Therefore, the appellate court's conclusion that

10 "CALJIC No. 2.15 only describes an inference that may be drawn from the evidence, and does

11 not purport to modify or lessen the ultimate burden of proof," Resp't Ex. C at 15, was not

12 contrary to, or an unreasonable application of Supreme Court law.  See 28 U.S.C. § 2254(d).

13     CALJIC No. 2.15 does not permit the jury to infer guilt from possession of stolen

14 property alone.  Instead, it also requires corroborating evidence.  The instruction lists various

15 corroborating circumstances, including other evidence tending to connect Petitioner with the

16 crime charged.  These corroborating circumstances were present here, as evidenced by the

17 testimony of Petitioner's co-defendant, Sam Vaughn.  Vaughn testified that Petitioner yelled at

18 him to "get the gun" away from McElmore and that he pulled the shotgun out of McElmore's

19 hands.  RT 1094.  Vaughn also testified that he was "not going to let [McElmore] get this

20 weapon," and that after a struggle he "yanked [the shotgun] out of [McElmore's] hand[s]."  RT

21 1094-1095.  Vaughn later testified that he took the shotgun and put it in the back seat of the car

22 and Petitioner drove away from the scene.  RT 1097.  Vaughn finally testified that after

25  [11] In Barnes, the trial court instructed the jury that possession of recently stolen property, if

26 not satisfactorily explained, is ordinarily a circumstance from which the jury could infer that the
person possessed the property with knowledge that it was stolen.  The Supreme Court rejected the

27 challenge to the instruction, stating that "[i]n the present case the challenged instruction only
permitted the inference of guilt from unexplained possession of recently stolen property."  Barnes,

28 412 U.S. at 843.

22

United States District Court

For the Northern District of California

1  dropping Petitioner off at his home, he hurled the shotgun into the water near Emeryville.  RT

2  1099.  The record clearly indicates that Petitioner had knowledge of Vaughn's actions,

3  encouraged him to take the shotgun away from McElmore, and drove away from the scene in

4  possession of the stolen shotgun.

5      The Court finds that CALJIC No. 2.15 is constitutionally sound because it creates a

6  permissive inference that allows, but does not require, the jury to infer an essential fact.[12]  See

7  Schwendeman v. Wallenstein, 971 F.2d 313, 316 (9th Cir. 1992), cert. denied, 506 U.S. 1052

8  (1993).  Habeas relief is not warranted because CALJIC No. 2.15 did not so infect the entire

9  trial that the resulting conviction violated due process.  Estelle, 502 U.S. at 72.

10      In reviewing the record, the Court finds that the jury was also instructed: (1) to "decide

11  all questions of fact . . . from the evidence," RT 1334 (CALJIC No. 1.00); (2) to "[c]onsider the

12  instructions as a whole and each in light of all the others," RT 1333 (CALJIC No. 1.01); (3)

13  "before an inference essential to establish guilt may be found to have been proved beyond a

14  reasonable doubt, each fact or circumstance on which the inference necessarily rests must be

15  proved beyond a reasonable doubt," RT 1337 (CALJIC No. 2.01); and (4) that "[a] defendant in

16  a criminal action is presumed to be innocent until the contrary is proved" placing "upon the

17  People the burden of proving him guilty beyond a reasonable doubt," RT 1348 (CALJIC No.

18  2.90).  Moreover, CALJIC No. 2.15 was immediately followed by CALJIC No. 17.10: "If you

19  are not satisfied beyond a reasonable doubt that the defendants are guilty of the crimes charged,

20  you may nevertheless convict him of any lesser crime, if you are convinced beyond a

21  reasonable doubt that the defendant is guilty of a lesser crime."  RT 1356 (emphasis added).

22  Reading CALJIC No. 2.15 together with the other instructions, the Court agrees with the

23  appellate court's conclusion that CALJIC No. 2.15 did not shift the burden of proof to Petitioner

24  or allow the jury to infer an improper fact.  See Schwendeman, 971 F.2d at 316.

25

26

27      [12]  The first sentence of CALJIC No. 2.15 states that "conscious possession of . . . stolen
28  property is not itself sufficient to permit an inference that the defendant is guilty of the crime of
    robbery or burglary."  CALJIC No. 2.15.  This sentence makes it clear that the requisite
    corroborating evidence creates a permissive inference rather than a mandatory presumption.

23

United States District Court

For the Northern District of California

1    In sum, there is no reasonable likelihood that the jury applied CALJIC No. 2.15 in an

2    unconstitutional manner, thus Petitioner's conviction did not violate due process.  See Estelle,

3    502 U.S. at 72.  Furthermore, Petitioner failed to make the requisite showing for habeas relief,

4    i.e., that the instruction, when considered in the context of the instructions as a whole, so

5    infected the trial that the resulting conviction violated due process.  See Estelle, 502 U.S. at 72.

6    Accordingly, Petitioner is not entitled to habeas relief based on his claim that the trial

7    court used an erroneous jury instruction.

8    **C.      Current Sentence Constitutes Cruel and Unusual Punishment**

9    **1.      Background**

10   Petitioner was sentenced, under California's Three Strikes law, to an unstayed sentence

11   of twenty-five years to life in prison.  Petitioner claims that his sentence constitutes cruel and

12   unusual punishment in violation of the Eighth Amendment.  (Pet'r App. A at 15.)

13   **2.      Applicable Federal Law**

14   A criminal sentence that is significantly disproportionate to the crime for which the

15   defendant was convicted violates the Eighth Amendment.  See Solem v. Helm, 463 U.S. 277,

16   303 (1983) (sentence of life imprisonment without possibility of parole for seventh nonviolent

17   felony violates the Eighth Amendment).  "[O]utside the context of capital punishment,

18   successful challenges to the proportionality of particular sentences will be exceedingly rare."

19   Id. at 289-90 (citation and quotation marks omitted) (emphasis in original).  The Eighth

20   Amendment prohibition on cruel and unusual punishment "does not require strict

21   proportionality between crime and sentence.  Rather, it forbids only extreme sentences that are

22   'grossly disproportionate' to the crime."  Harmelin v. Michigan, 501 U.S. 957, 1001 (1991)

23   (quoting Solem, 463 U.S. at 288, 303) (Kennedy, J., concurring).[13]  Under this proportionality

24

25   _____

26   [13] In analyzing this claim, the Court must turn to clearly established federal law during the
time of the relevant state court decision, which is the California Supreme Court's summary denial of
27   Petitioner's petition for review on October 24, 2001.  See Williams, 529 U.S. at 412.  The Court
"looks through" the unexplained California Supreme Court decision to the last reasoned state court
28   decision -- the appellate court's decision -- which was also issued in 2001.  See Shackleford, 234
F.3d at 1079.  This Court notes that since 2001, the Supreme Court has clarified its decision in

United States District Court

For the Northern District of California

principle, the threshold determination for the court is whether a petitioner's sentence is one of the rare cases in which a comparison of the crime committed and the sentence imposed leads to an inference of gross disproportionality.  United States v. Bland, 961 F.2d 123, 129 (9th Cir.), cert. denied, 506 U.S. 858 (1992) (quoting Harmelin, 501 U.S. at 1005).  Only if such an inference arises does the court proceed to compare a petitioner's sentence with sentences in the same and other jurisdictions.  See Harmelin, 501 U.S. at 1004-05; Bland, 961 F.2d at 129.

The threshold for an "inference of gross disproportionality" is quite high.  See, e.g., Harmelin, 501 U.S. at 1005 (mandatory sentence of life without possibility of parole for first offense of possession of 672 grams of cocaine did not raise inference of gross disproportionality).  In addition, a court may take into account the State's interest not only in punishing the offense of conviction, but also its interest "'in dealing in a harsher manner with those who [are] repeat[] criminal[s].'"  Bland, 961 F.2d at 129 (quoting Rummel v. Estelle, 445 U.S. 263, 276 (1980)).

### 3.    Analysis

The appellate court rejected Petitioner's claim that his sentence of twenty-five years to life constituted cruel and unusual punishment, stating:

> In California a sentence may be unconstitutional "if, although not cruel or unusual in its method, it is so disproportionate to the crime for which it is inflicted that it shocks the conscience and offends fundamental notions of human dignity." (*In re Lynch* (1972) 8 Cal.3d 410, 424, fn. omitted.)  A defendant is provided no greater protection under the United States Constitution's prohibition against cruel and unusual punishment than under the law in California.  (*People v. Martinez* (1999) 71 Cal.App.4th 1502, 1510.)

> To support his claim that the sentence imposed violates the federal and state proscriptions against cruel and unusual punishment, Ahmed focuses upon what he characterizes as the "draconian" provisions of the Three Strikes law.  However, other courts have already determined that, as a general matter, California's Three Strikes law is not so disproportionate with respect to the punishment this state imposes for other offenses or with respect to the

_____

Harmelin and confirmed that Justice Kennedy's proportionality principle is clearly established law. See Ewing v. California, 538 U.S. 11, 23 (2003) (applying the Harmelin standard); United States v. Carr, 56 F.3d 38, 39 (9th Cir. 1995); see also United States v. Dubose, 146 F.3d 1141, 1146-47 (9th Cir. 1998) (after Harmelin, the Eighth Amendment forbids "at most" only sentences that are "grossly disproportionate").

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**United States District Court**
For the Northern District of California

punishments other jurisdictions impose for similar recidivist conduct, that it violates the prohibition against cruel or unusual punishment.  (See, e.g., *People v. Martinez*, *supra*, 71 Cal.App.4th at pp. 1509-1517; *People v. Barrera* (1999) 70 Cal.App.4th 541, 555-556; *People v. Cline* (1998) 60 Cal.App.4th 1327, 1337-1338; *People v. Kinsey* (1995) 40 Cal.App.4th 1621, 1630-1631.)

The legal principles we apply to Ahmed's constitutional claim are well settled.  When analyzing whether a sentence is cruel or unusual within the meaning of the state's constitution, a court may: (1) examine the nature of the offense and/or the offender, with particular regard to the degree of danger both present to society; (2) compare the challenged punishment with that prescribed for more serious offenses in the same jurisdiction; and (3) compare the challenged punishment with that prescribed for the same offense in other jurisdictions.  (*In re Lynch*, *supra*, 8 Cal.3d at pp. 425-427.)  The court's inquiry into the nature of the offender must ask whether the punishment is grossly disproportionate to the defendant's individual culpability, as shown by factors such as his age, prior criminality, personal characteristics, and state of mind.  (*People v. Dillon*, *supra*, 34 Cal.3d at p. 479.)

The crimes committed by Ahmed and his co-appellant Vaughn were extremely serious.  While Ahmed was found not guilty of the near-fatal assault on McElmore, he did participate in the commission of the crime by assisting Vaughn to locate the victim with the intention of carrying out an act of revenge.  In doing so, Ahmed participated in the false imprisonment of McElmore's girlfriend, Cherry Johnson, in enlisting her help to assist them in locating victim McElmore.

Further, Ahmed was charged and convicted of aiding and abetting by taking the shotgun away from McElmore, thereby constituting a robbery, a serious felony offense.  While Ahmed did not inflict actual physical injury to victim McElmore, he did nothing to stop or prevent co-defendant Vaughn's criminal actions.  The victim, who was 32 years old at the time of sentencing, remains so severely brain damaged that he will require 24-hour care in an institution for the rest of his life.

Another part of the inquiry "focuses on the particular person before the court, and asks whether the punishment is grossly disproportionate to the defendant's individual culpability as shown by such factors as his age, prior criminality, personal characteristics, and state of mind. [Citation.]"  (*People v. Thompson* (1994) 24 Cal.App.4th 299, 305.)  Ahmed, who was 26 years old at the time of sentencing, began committing crimes as a juvenile at the age of 16.  When he became an adult, the seriousness of his crimes escalated, resulting in a state prison commitment.  His most notable adult convictions include possession of a sawed-off shotgun (§ 12020), grand theft with use of a firearm (§ 487.1), and shooting at an inhabited dwelling (§ 246).  Ahmed's prior performance on parole has been unsuccessful.  He has continued to reoffend with drugs and weapons offenses and was returned to custody at least twice before his discharge.  Ahmed was subsequently discharged from parole on January 10, 1998.  He was only off parole for a little over a month when he committed the crimes for which he now stands convicted.  It could fairly be said that Ahmed's unrelenting violent criminality and the current offenses validates application of the Three Strikes law.  (*People v. Martinez*, *supra*, 71 Cal.App.4th at p. 1512.)

Appellant argues that his punishment is disproportionately harsh when

26

compared with sentences imposed in California for other serious or violent felonies such as rape, voluntary manslaughter, or kidnapping.  The comparison fails because it ignores his recidivism.  (*People v. Martinez*, *supra*, 71 Cal.App.4th at p. 1512; *People v. Cooper* (1996) 43 Cal.App.4th 815, 825-826.)

Ahmed also complains that his cohort, appellant Vaughn, was punished less harshly, even though he was the "primary actor in the criminal episode."  But appellant Vaughn did not escape strong punishment.  Vaughn was sentenced to 11 years 6 months for his participation in this crime.  However, unlike Ahmed, Vaughn was not a three-strike offender.  The sentences imposed upon the two defendants here are in marked contrast to *Dillon*, where one defendant was sentenced to life imprisonment while the others suffered only "petty chastisements."  (*People v. Dillon*, *supra*, 34 Cal.3d at pp. 487-488.)

Appellant also argues that his punishment is harsher than that which would have been imposed in other jurisdictions for the same offense.  A similar argument was made in *People v. Martinez*, *supra*, 71 Cal.App.4th 1502, in which a defendant was sentenced to 25 years to life under the Three Strikes law after entering a plea of no contest to possessing methamphetamine, attempting to deter an officer from carrying out his duty, and three alcohol or drug-related misdemeanors.  On appeal, the court rejected the claim that the life sentence constituted an unconstitutionally cruel and unusual punishment.  In methodically comparing recidivist statutes throughout the country, the court acknowledged that California is among the few states to impose a life sentence for a third felony conviction that is neither violent nor serious, where at least one prior crime involved violence.  It concluded, however, that although California's punishment scheme is among the most extreme, that fact does not compel the conclusion that it is unconstitutionally cruel or unusual.  The court reiterated that the needs and concerns of a particular state may induce it to treat certain crimes or treat particular repeat offenders more severely than in any other state.  The judiciary will not interfere with the Legislature's choice of a fitting and proper penalty unless that penalty is all out of proportion to the offense.  (*Id.* at pp. 1512-1516.)  We conclude, as have other courts when presented with the same issue, that appellant has failed to establish his sentence is disproportionate when compared to recidivist statutes in other jurisdictions.  (*People v. Cline*, *supra*, 60 Cal.App.4th at p. 1338; *People v. Cooper*, *supra*, 43 Cal.App.4th at pp. 826-828.)

In conclusion, given Ahmed's extensive criminal history and the nature of the current offense, his 25-year-to-life sentence neither shocks the conscience nor violates notions of human dignity.  Thus, it does not constitute cruel or unusual punishment under the state or federal constitutions.

Resp't Ex. C at 22-24.

Petitioner argues that he received a life sentence "for false imprisonment and a single prior incident which happen [sic] to involve multiple counts."[14]  (Traverse at 13.)  While Petitioner admits that "robbery and false imprisonment are necessarily serious crimes," he

---

[14] Petitioner refers to his three prior strike convictions, which all stemmed from one incident in 1992.

United States District Court
For the Northern District of California

1    argues that his "involvement was determined by the jury to be rather minimal and did not

2    directly result in injury to the victims." (Pet'r App. A at 18.)  Petitioner also compared his

3    sentence to that of his co-defendant, Vaughn,[15] who he argues was "the primary actor in the

4    criminal episode," to support his claim that his sentence was disproportionate.  (Id.)

5        In rejecting Petitioner's claims, the appellate court rationalized that Petitioner's sentence

6    of twenty-five years to life under California's Three Strikes law punishes not only his current

7    offenses, but also his recidivism.  See Resp't Ex. C at 24 (citing People v. Martinez, 71

8    Cal.App.4th 1502, 1512 (Ct. App. 1999) ("It could fairly be said that Ahmed's unrelenting

9    violent criminality and the current offenses validates application of the Three Strikes law.").

10   Furthermore, the appellate court found that Vaughn's sentence was not disproportionate to

11   Petitioner's because Vaughn was not a three-strike offender.  See id.

12       When viewed in light of his criminal history and current felony convictions, the Court

13   finds that Petitioner's case is not that "rare case in which a threshold comparison of the crime

14   committed and the sentence imposed leads to an inference of gross disproportionality."

15   Harmelin, 501 U.S. at 1005.  Furthermore, the appellate court reasonably applied the gross

16   disproportionality standard in rejecting Petitioner's Eighth Amendment claim.  The appellate

17   court considered the current offenses of false imprisonment and robbery as well as Petitioner's

18   three prior strikes for assault with a deadly weapon and reasonably concluded that his sentence

19

20   was not unconstitutionally disproportionate in light of his current offense and criminal history.[16]

21    See Resp't Ex. C at 25.  Therefore, the appellate court's rejection of Petitioner's claim was not

22   contrary to or an unreasonable application of clearly established federal law as determined by

23   the Supreme Court.  See 28 U.S.C. § 2254(d); see, e.g., Rummel, 445 U.S. at 284-85 (upholding

24

25       [15]  Vaughn was sentenced to prison for eleven years and six months for robbery, false

26   imprisonment, and attempted voluntary manslaughter.  See Resp't Ex. C at 24.

27       [16]  The appellate court also stated, "[w]hen [Petitioner] became an adult, the seriousness of
     his crimes escalated, resulting in a state prison commitment.  His most notable adult convictions
28   include possession of a sawed-off shotgun (§ 12020), grand theft with use of a firearm (§ 487.1), and
     shooting at an inhabited dwelling (§ 246)."  Resp't Ex. C at 24.

28

life sentence of recidivist convicted of fraudulent use of credit card of $80, passing forged check for $28.36 and obtaining $120.75 under false pretenses); <u>Harmelin</u>, 501 U.S. at 996 (upholding sentence of life without possibility of parole for first offense of possession of 672 grams of cocaine).[17]

Accordingly, Petitioner is not entitled to habeas relief on his Eighth Amendment claim.

<b><u>CONCLUSION</u></b>

For the foregoing reasons, the petition for a writ of habeas corpus is DENIED.  The Clerk of the Court shall enter judgment and close the file.

IT IS SO ORDERED.

DATED: February 28, 2006

_Saundra B Armstrong_
SAUNDRA BROWN ARMSTRONG
United States District Judge

---

[17] <u>See, e.g.</u>, <u>Ewing</u>, 538 U.S. at 29-30 (upholding sentence of twenty-five years to life for recidivist convicted most recently of grand theft); <u>Harris v. Wright</u>, 93 F.3d 581, 584 (9th Cir. 1996) (sentence of life without parole for fifteen-year-old murderer does not raise inference of gross disproportionality); <u>Carr</u>, 56 F.3d at 39 (sentence of twenty-two years upon conviction for sale of 66.92 grams of cocaine base with enhancement under Federal Sentencing Guidelines' career offender provision for two previous convictions for minor drug sales was not grossly disproportionate).

United States District Court
For the Northern District of California